UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA LEBEL, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 CV 08432 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| INSIGHT SECURITIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Sandra Lebel brings this lawsuit against her former employer, Insight Securities, Inc., claiming she was discriminated against on the basis of her age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., and the basis of her sex, in violation of Title VII, 42 U.S.C. § 2000e et seq.[1] Insight has moved for summary judgment. R. 42.[2] For reasons explained below, the motion is denied.

## I. Background

The facts narrated below are undisputed unless otherwise noted (and if disputed, the evidence is reasonably viewed in Lebel's favor).[3] Sandra Lebel is a gay woman and was 57 years old when she filed the complaint in 2018. R. 1, Compl. ¶ 2.

---

[1]The Court has federal question jurisdiction under 28 U.S.C. § 1331.

[2]Citations to the record are noted as "R." followed by the docket number, and when necessary, the page or paragraph number.

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Insight's Statement of Facts [R. 46]; "Pl. Resp. DSOF" for Lebel's response to the Insight's Statement of Facts [R. 51]; "PSOF" for Lebel's Statement of Additional Facts [R. 57]; and "Def. Resp. PSOF" for Insight's response to Lebel's Statement of Additional Facts [R. 62].

In February 2015, Insight hired Lebel as an Assistant Operations Manager. PSOF ¶ 4. Insight is a securities broker-dealer owned by its President and CEO, Carlos Legaspy. DSOF ¶¶ 1, 4-5. As an independent securities broker-dealer, Insight "services independent representatives and advisors that affiliate as independent contractors for firms that hire Insight for custody and execution services." DOSF ¶ 1. Soon after she was hired, Lebel became a Branch Liaison in the Operations Department. PSOF ¶ 4. As part of her qualifications, Lebel held both a Series 7 and a Series 24 license. R. 51-12, Pl. Resp. DSOF, Exh. 12, Lebel Aff. ¶ 1. As explained by Lebel, a Series 7 license "qualifies the holder as a general securities representative and entitles the holder to solicit, purchase, and sell securities products," and a Series 24 license "qualifies the holder as a general securities principal and entitles the holder to serve as the Office of Supervisory Jurisdiction supervising and managing the activities of a branch that sells securities." *Id.*

In 2016, Total Advisors, LLC, an independent trading advisory firm, contracted with Insight to service buy-sell orders cleared through Insight's clearing firm. DSOF ¶¶ 3, 8-10. A related company, Pro Advisors, LLC, signed a similar agreement with Insight in July 2016. *Id.* ¶¶ 8, 11. Initially, Insight serviced these firms from Insight's branch office in Coral Gables, Florida. *Id.* ¶ 8. In September 2016, Insight established a new Miami branch office designed specifically to handle business from Total and Pro. *Id.* ¶¶12-13. The following month, Lebel became Branch Manager of this office. *Id.* ¶ 15. In this role, Lebel's salary increased $15,000 to $70,000. *Id.* ¶ 16.

Total and Pro reimbursed Insight around $7,500 a month to offset Lebel's compensation. *Id.* ¶ 18. Lebel supervised the Miami branch remotely out of Insight's Highland Park, Illinois office. *Id.* ¶ 20. Insight also hired Larry Rozas, Diego De la Lama, and Nicolas Villarreal to work in the Miami branch as representatives under Lebel's supervision. *Id.* ¶ 17; 46-1, DSOF, Exh. A, Legaspy Dep. at 17:20-24

## A. Termination of Employment

In Spring 2017, Insight's clearing firm instructed it to terminate its relationship with Total and Pro. DSOF ¶ 22. Eventually, on September 29, 2017, Insight informed Total and Pro in writing that Insight would cease handling Total's and Pro's customer accounts effective December 31, 2017. *Id.* ¶ 25. In October 2017, Lebel received an email from Operations Manager Jennifer Mayer advising that "[a]ll of Pro will be leaving gradually." *Id.* ¶ 51. On January 10, 2018, Legaspy (Insight's CEO) informed Lebel that she had been fired because her position was eliminated *Id.* ¶ 39. Legaspy explained that Insight could no longer afford her salary because of the loss of the Total and Pro business. *Id.* Lebel did not believe Legaspy's explanation. *Id.* ¶ 49. Seven days before Lebel's firing, Insight hired David Lino to a Branch Liaison position. PSOF ¶ 14. Of the five employees Insight fired after Legaspy took control of Insight in December 2012, three were women age 56 or older and one was a 48 year-old man. *Id.* ¶ 37. Lebel is the only Insight employee who was fired due to a purported elimination of a job position. *Id.* When Lebel was fired, 26 of 37 Insight employees were over 40 years old. DSOF ¶ 55.

Meanwhile, Miami employees Rozas, De la Lama, and Villareal, whom Lebel supervised, were given the option to leave the firm or transition into commission-based sales roles. DSOF ¶ 36. All three chose to stay with Insight and became representatives at a new sales-generating Miami branch. *Id.* ¶¶ 41, 43. In particular, Rozas (who was 28 years old) became Branch Manager of the new Miami branch after Lebel was fired. PSOF ¶ 35. According to Insight, Rozas did not take over *Lebel's* Branch Manager responsibilities. Def. Resp. PSOF ¶ 35. Instead, Insight contends that Rozas became the Branch Manager of a new sales-based branch. *Id.* At this new branch, Insight personnel could generate sales as opposed to simply servicing them. DSOF ¶¶ 42(b)-(c). Rozas became the Branch Manager in large part because De la Lama and Villareal wanted him to fill that position. *Id.* ¶¶ 42(a), 43. Rozas also had the necessary securities-related licenses and spoke Spanish. *Id.* ¶ 43. The new branch generally conducted business with Spanish speakers from Mexico, Panama, Argentina, Chile, and Venezuela. *Id.* ¶ 42(e).

According to Insight, Lebel was not offered the new Branch Manager position for several reasons:

- The hire required the approval of De la Lama, Villareal, and Rozas, who would be financially responsible for the branch manager's compensation. *Id.* ¶ 42(a).

- As a sales generating branch, the new Miami branch would have to implement new regulations that were not in effect at the branch that Lebel supervised. *Id.* ¶ 42(b), (c).

- Lebel lacked supervisory experience for sales practices. *Id.* ¶ 42(d).

- Lebel did not speak Spanish, which was required of the position. *Id.* ¶¶ 42(e)-(g); 47.

4

- The Branch Manager needed to be located on-site. *Id.* ¶ 42(h).

## B. Workplace Allegations

In December 2016, Lebel introduced her wife to Legaspy during the company Christmas party. DSOF ¶ 60. Afterwards, Lebel believed that Legaspy became stand-offish and shunned her as if she were a "stepchild" or a "leper" by ignoring her and excluding her from certain meetings. *Id.* ¶¶ 60, 70. Lebel also testified that she felt isolated because she sat in a corner away from the rest of the office. *Id.* ¶ 73. Lebel did not, however, hear Legaspy make any negative comments against gay persons. *Id.* ¶ 59. And Lebel generally did not know the substance of the meetings from which she was excluded. *Id.* ¶ 72. Lebel brought her wife along to Las Vegas for various Insight meetings in July 2017. *Id.* ¶ 61. Insight paid for the couple's flights and lodging, and paid for them to stay in the room an extra weekend. *Id.*

Lebel also believed that some of her colleagues engaged in conduct that contributed to an isolating and hostile environment (though, as noted later, Lebel does not formally advance a hostile work environment claim in this case). According to Lebel, two female workers would routinely describe a male co-worker's food in a sexually suggestive manner. Pl. Resp. DSOF ¶ 65. The younger of the two women would also rub her breasts on the male employee. *Id.* Lebel also believed that certain of her co-workers were mocking her. *Id.* ¶ 67. She testified that two colleagues would regularly look her way while laughing. *Id.* Lebel did not, however, describe the substance of their statements, other than that they would comment on her clothes in a mocking tone. *Id.* ¶ 67.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable" to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).[4] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then "set forth

---

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

Insight has moved for summary judgment against Lebel's claims of age and sex discrimination. R. 42. In light of the overlap in many of the relevant facts, the Court will analyze both forms of discrimination together. The Age Discrimination in Employment Act (ADEA) makes it "unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The protections under the ADEA apply to individuals who are 40 and older. 29 U.S.C. § 631(a).

Employers violate Title VII of the 1964 Civil Rights Act when they discriminate against their employees on the basis of sex. 42 U.S.C. § 2000e-2(a). An employee bringing a Title VII claim must prove either a tangible employment action such as "a hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998), or a hostile work environment that is so severe or pervasive that it in effect alters the plaintiff's employment conditions, *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-47 (2004). (As noted later, there is no formal hostile work environment in this case; Lebel does not advance that type of claim in her response brief.)

A plaintiff suing under either the ADEA or Title VII may survive summary judgment based on either the cumulative circumstantial evidence or the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Martino v. MCI Communications Services, Inc.*, 574 F.3d 447, 452 (7th Cir. 2009). Because both methods may rely on circumstantial evidence, however, the distinction can sometimes be wispy. *Id.* In *Ortiz*, the Seventh Circuit clarified that all evidence, whether "direct" or "indirect," "belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016). This does not, however, render nugatory the *McDonnell Douglas* framework. *Id.* at 766.

Under this framework, Lebel must first establish a *prima facie* case, which requires her to show that that (1) she is a member of a protected class; (2) her job performance met legitimate expectations; (3) she suffered an adverse employment action; and (4) Insight treated another similarly situated employee who was not a member of the protected class more favorably. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973*); LaRiviere v. Board of Trustees of Southern Ill. Univ.*, 926 F.3d 356, 360 (7th Cir. 2019). If successfully shown, the burden shifts to Insight to provide a legitimate, nondiscriminatory reason for the adverse action. *Coleman v. Donahue*, 667 F.3d 835, 845 (7th Cir. 2012). If Insight successfully meets its burden, then the burden shifts back to Lebel, "who must present evidence that the stated reason is a pretext, which in turn permits an inference of unlawful discrimination."

8

*Id.* (cleaned up). At that point, the question is whether the employer "honestly believed the reason it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)

Outside of the *prima facie* framework, Lebel can survive summary judgment if she presents enough cumulative evidence that would allow a reasonable jury to infer that an employment decision was motivated by discrimination. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). For an ADEA claim specifically, she must present cumulative evidence allowing a reasonably jury to infer that her age was a "but-for" cause of any adverse action. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78, (2009). It is not enough to show that age was merely a motivating factor. *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009). In other words, Lebel must prove that, but for her age, the adverse action would not have occurred. *Id.* "In this respect, the ADEA is narrower than Title VII ... [because] Title VII protects against mixed-motive discrimination." *Carson v. Lake County*, 865 F.3d 526, 532 (7th Cir. 2017).

As noted earlier, in this case, there is significant overlap in the record evidence relating to Lebel's age and sex discrimination claims. So this Opinion will generally analyze the evidence with regard to each claim at the same time. When necessary, the Court will separately discuss the distinct evidence on each claim. It appears that two adverse actions are at issue: Lebel's firing and Insight's refusal to consider her for other openings at Insight. Each will be discussed in turn.

It is worth noting at the outset, however, that although Insight frames Lebel's Title VII claim as based on her sexual orientation,[5] *see* R. 44, Def. Br. at 9-10, Lebel does not advance that liability theory in her response brief. There is a passing reference in the EEOC charge to sexual orientation, R.1-1, Compl., Exh 1 at 2, but the Complaint does not explicitly refer to it and the summary judgment response brief makes no mention of it, instead referring only to sex discrimination in the sense of gender discrimination. R. 58, Pl. Resp. Br. at 1-3, 6-7, 15. So there is no Title VII claim for discrimination on the basis of sexual orientation.

## A. Termination

On Lebel's firing, Insight argues that she fails to present evidence creating a reasonable inference that her age was the but-for cause. Def. Br. at 7. According to Insight, Lebel's employment was terminated because Insight ceased doing business with Total and Pro. *Id.* at 7-8. Those two clients accounted for 82% of revenue for the Miami branch and even reimbursed Insight for Lebel's salary. *Id.* at 8. Insight also points to its employee roster (as of December 31, 2017), which shows that 26 of its 37 employees were over 40 years old. DSOF ¶ 55. On the Title VII claim, Insight argues that it is entitled to summary judgment because Lebel offers no evidence of derogatory comments or mistreatment based on gender, other than what Insight calls her unfounded perception of how her co-workers treated her. Def. Br. at 9.

---

[5]Insight also contends that Lebel alleged "hostile work environment" as a separate grounds of relief. Def. Br. at 11. But there is nothing in Lebel's summary judgment briefing that suggests she is still advancing this theory. To be clear, because she has not responded to that argument, there is no longer a hostile-environment claim in this case (if there ever was).

### 1. *McDonnell Douglas*

One way to analyze the summary judgment record is through the burden-shift-ing framework of *McDonnell Douglas.* The first question is whether Lebel has shown *prima facie* cases for sex and age discrimination. The first three elements are not in dispute. Lebel is a woman older than 40 who was fired despite her generally satisfac-tory performance. Def. Resp. PSOF ¶ 23; R. 51-2, Pl. Resp. DSOF, Exh 2, Lebel Dep. at 145:2-146.22; Pl. Resp. DSOF ¶¶ 33(2), 39.

The last element, on the other hand, is contested. To satisfy this element, Lebel must present evidence that another similarly situated employee, not belonging to the protected class, was more favorably treated. Insight does not dispute that Lebel was the only employee to have been fired due to the loss of the Total and Pro revenue. Def. Resp. PSOF ¶ 37. Specifically, there is no dispute that the following employees kept their jobs in the operations department: David Lino (25), Paul Selman (25), Dhimitri Agolli (36), Paul Pulte (48), and Jennifer Mayer (31). PSOF ¶ 34.

The disputed issue is whether these employees are similarly situated to Lebel for purposes of the *prima facie* case. Whether an employee is similarly situated is "a flexible, common-sense, and factual inquiry." *David*, 846 F.3d at, 225 (cleaned up). "A single comparator will do; numerosity is not required." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 406–07 (7th Cir. 2007), *aff'd on other grounds,* 553 U.S. 442 (2008). Nor is an exact match required: a "plaintiff need not present a doppelganger who differs only by having remained in the employer's good graces." *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008). "The comparator must still be similar

enough to eliminate confounding variables, such as differing roles, performance his-
tories, or decision-making personnel, [so as to] isolate the critical independent varia-
ble: complaints about discrimination." *Id.* (cleaned up).

Insight characterizes Lebel as unique among the Miami employees because her
move to Branch Manager was allegedly a promotion that created duties specific to
the Total and Pro business. DSOF ¶¶ 15, 30. In response, Lebel denies that the new
title bestowed new responsibilities. Pl. Resp. DSOF ¶¶ 14-15; PSOF ¶ 6. Specifically,
Lebel points to evidence that she retained the same core responsibilities when moving
from Branch Liaison to Branch Manager. Pl. Resp. DSOF ¶ 15. These duties included
reviewing and approving trade blotters, signing off on paperwork, opening new ac-
counts, providing back office support, and completed bank paperwork. Lebel Dep. at
31:5-32:7; 215:5-216:10. Lebel thus contends that Lino, Selman, and Agolli (Branch
Liaisons who are men under 40 years old) were similarly situated at the time of her
firing. Pl. Resp. at 7. Lebel also testified that she still reported to Jennifer Mayer,
even after Lebel became branch manager. Lebel Dep. at 31:16-18 ("[e]ven when I was
branch manager there I reported to her."). Furthermore, Lebel also testified that
Mayer had a supervisory role as a Series 24 principal, in addition to performing some
Branch Liaison functions.[6] Lebel Dep. at 217:3-16; Lebel Aff.¶¶ 7–8.

On review of the record, a reasonably jury could find, when viewing the evi-
dence in Lebel's favor, that there was no substantial evolution in Lebel's duties when

---

[6]This, in fact, suggests that Mayer may be the strongest comparator for Lebel's *age*-
discrimination claim. Lebel presents evidence that Lebel, too, was a Series 24 principal who
also performed supervisory and Branch Liaison functions simultaneously. DSOF ¶ 21; PSOF
¶ 5.

she transitioned to Branch Manager. In its response to Lebel's Statement of Additional Facts, Insight essentially concedes that Lebel retained the same responsibilities throughout. *See* Def. Resp. PSOF ¶ 6. Insight adds only that Lebel performed those responsibilities with respect to representatives at branches *for which she was the supervisor. Id.* Even if true, this shows no material change in responsibilities; it only shows a change in the representatives *for whom* Lebel performed those responsibilities. For purposes of summary judgment, Lebel has shown that similarly situated employees at Insight did not lose their jobs. As a result, then, she has shown a *prima facie* case of discriminatory termination based on her age and sex.

It is worth noting that Lebel has also established a *prima facie* case under what is known as a mini-reduction-in-force, which applies when a plaintiff's job is eliminated. This would not require Lebel to demonstrate that a comparator was similarly situated. *See Griffin v. Sisters of Saint Francis, Inc.,* 489 F.3d 838, 845 (7th Cir. 2007). In a mini-RIF case, an employee's unique position is terminated; her position is not filled; but employees outside the protected class absorb the fired employee's responsibilities. *Id.* To guard against the danger that the employer can hide a discriminatory motive for terminating the employee simply by stating that the job was eliminated, the plaintiff is not required to show that similarly situated employees were treated more favorably. *Id.* Instead, she needs only to establish that her duties were absorbed by employees outside the protected class. *Id.*

At this stage, Lebel has presented enough evidence, when viewed in her favor, to show that her unique position was absorbed by employees who were either male or

younger (or both). Though Lebel would contend that her responsibilities were not necessarily unique, the parties do not dispute that Lebel was the Branch Manager for an office specifically created to handle Pro and Total business. Pl. Resp. DSOF ¶¶ 13, 30. In this sense, Lebel was "uniquely" situated among Insight employees. *Griffin*, 489 F.3d at 845. She was also told that her told her position was eliminated. DSOF ¶¶ 30-31, 33.

With respect to the absorption of duties, former Insight Vice President Ross Greenspan testified that Insight serviced Total and Pro customers up until July 2018, six months *after* Lebel's firing. Def. Resp. PSOF ¶ 20. Insight does not contest this testimony. *Id.* Lebel has also presented evidence that she maintained her prior operations responsibilities, even after she became Branch Manager. Pl. Resp. DSOF ¶ 15. A reasonable juror could infer that after Lebel's employment was terminated, her responsibilities, including those specific to Total and Pro customers, would have been absorbed by younger male employees in the operations department such as Lino (25), Selman (25), Agolli (36), and Mayer (31), regardless of whether they were otherwise similarly situated.[7] So, under the *prima facie* framework that applies to a mini-RIF, Lebel has enough evidence.

---

[7]Lebel also contends that the hiring of Larry Rozas (28 years old) as the Branch Manager of the new *sales-based* Miami Branch establishes a *prima facie* case under a mini-RIF standard. Pl. Resp. at 4-5. But Lebel has no evidence that Rozas absorbed any of her duties. Although Lebel asserts that "Legaspy assigned Plaintiff's Branch Manager responsibilities to Larry Rozas," PSOF ¶ 35, she points to deposition testimony that does not support that proposition. Instead, the testimony simply shows that Rozas became Branch Manager of the new sales-based Miami Branch. *See* Legaspy Dep. at 72:4-16, 78:24-80:3, 168:15-17. Lebel does not point to any other evidence suggesting that Rozas took on any of her responsibilities.

With the *prima facie* case in place, it is Insight's burden to present a legitimate, non-discriminatory reason for Lebel's firing. Insight proffers that it ceased doing business with Total and Pro customers, losing their revenue and the salary reimbursement they provided to defray Lebel's salary. DSOF ¶ 32. According to Insight, the loss of Total and Pro eliminated 82% of the Miami branch's revenue. *Id.* As a result, Insight closed the Miami branch and terminated Lebel's employment because her position was eliminated. *Id.* ¶¶ 30-31, 33. Insight CFO Jerry Schwartz testified that he and Legaspy went over the company's financials to "[make] sure there was no other business that we had" other than Total and Pro that could maintain her salary. R. 51-10, Pl. Resp. DSOF, Exh. 10, Schwartz Dep. at 74:24-76:2. He further testified that they both "went through [their] business model" and determined that there was no means "anywhere else ... with the company." *Id.* at 76:2-10. According to Schwartz, the decision was "purely financial". *Id.* at 76:9-10. On its face, this financial-based reason suffices to satisfy Insight's burden to produce a non-discriminatory explanation.

So the burden shifts back to Lebel to provide evidence of pretext, at least enough for a reasonable jury to find in her favor. Lebel offers several categories of evidence to rebut the proffered explanation. First, she points to the fact that no other Insight employee was fired as a result of the alleged loss of Total and Pro business, despite the fact that the entire firm—or at least some other employees—performed functions related to Total and Pro. Pl. Resp. DSOF ¶ 33(1); Def. Resp. PSOF ¶ 10.

15

Insight concedes that no other employee was fired due to the loss of business, including representatives De la Lama, Villareal, and Rozas, who were based out of the supposedly eliminated Miami branch. Def. Resp. PSOF ¶ 37; DSOF ¶ 36.

Lebel also rebuts Insight's claims that the loss of Total and Pro's business placed the company in financial straits so dire that Insight had to fire her. Lebel points to year-over-year revenue increases from fiscal year 2016-17 ($22 million) to 2017-2018 ($29 million), and then again to 2018-19 ($32 million). Pl. Resp. DSOF ¶ 33(3); Legaspy Dep. at 113:2-12. Insight's fiscal year runs from July 1 to June 30. Legaspy Dep. at 113:1. To explain this, Insight argues that, from December 2017 to April 2018, there was a "spike" in revenues generated by Total and Pro accounts due to "mass liquidations" resulting from the wind-down period. R. 60, Def. Reply at 5; Legaspy Dep. at 107:2-12. But this does not address Lebel's broader assertion that there was enough *company-wide* revenue to support her retention. When asked about the $7 million annual increase in revenue for the fiscal year ending June 30, 2018, Legaspy testified that around $5 million was attributed to Total and Pro accounts. Legaspy Dep. at 117:2-10. So, according to Legaspy's own testimony, revenue in the fiscal year ending 2018 increased by around $2 million *even without* accounting for Total and Pro wind-down revenue. Legaspy further testified that Insight made a $750,000 profit in the fiscal year ending 2018, after paying everyone's salaries and bonuses. *Id.* 117:15-17. And in fiscal year 2019, Legaspy attributed revenue growth to additional registered representatives in the Montevideo branch, not to any liquidation of Total or Pro accounts. *Id.* at 113:10-24. Greenspan also testified that the

level of business at Insight stayed "similar or more" from the time that he first became aware of issues with Total and Pro up until June 2018. R. 51-5, Pl. Resp. DSOF, Exh. 5-1, Greenspan Dep. at 56:17-57:1. Insight also does not dispute that it hired another employee with a $80,000 yearly salary, albeit for the Human Resources department, in June 2018, because they "had the revenue, the income to afford another overhead salary." Def. Resp. PSOF ¶ 19. Neither does Insight dispute that it hired 12 new employees in 2018, 11 of which received salaries ranging from $40,000 to $120,000. *Id.* ¶ 18. All of this is enough fodder for a reasonable jury, viewing it in the light most favorable to Lebel, to find that Insight could have afforded to keep Lebel as an employee.

Lebel also puts forth evidence showing that Insight did not actually, at least to the extent Insight would have Lebel believe, lose business from Pro and Total in 2018 after placing that business on liquidating-only status. This status means that orders would only be processed to sell an existing long position or to cover an existing short position. DSOF ¶ 26. Legaspy testified that after April 2018, the revenue from Total and Pro was "basically zero." Legaspy Dep. ¶ 107:13-15. On the other hand, Greenspan testified that Insight continued to serve Total and Pro customers through the time Greenspan left the company in July 2018. Def. Resp. PSOF ¶ 20. Although it is possible to service customers without generating any revenue from April to July, this plants some doubt as to the sincerity of Insight's proffered explanation that revenue from Total and Pro was basically zero. Lebel also points to Greenspan's testimony, in which he stated his belief that Total and Pro were placed on liquidation status "in

17

limited circumstances." Greenspan Dep. at 31:22-32:12. Lastly, she points to evidence that shortly after her firing, Insight was discussing the retention of some end investor accounts with Total in a "full relationship" as opposed to a liquidation capacity. Legaspy Dep. at 136:11-140:3. This purportedly created some accounts "orphaned" from Total that Insight spread across existing Insight representative. *Id.* at 139:6-140:3.

Based on all of that evidence, Lebel has offered enough to demonstrate that the financial-based explanation for her firing was a pretext. So under the framework of *McDonnell Douglas*, she has sufficient evidence to survive summary judgment.

### 2. Totality of the Evidence

Separate from the *McDonnell Douglas* framework, viewing the cumulative evidence together would raise a triable issue of fact on the age and sex discrimination claims. This includes evidence that:

- Lebel was the only employee who was fired due to a purported elimination of her position. PSOF ¶ 37.

- At the time of Lebel's firing, Insight kept several younger employees and several male employees in the operations department. *Id* ¶ 34.

- Insight was generally satisfied with her job performance. Def. Resp. PSOF*;* ¶ 23; Lebel Dep. 145:2-146:22.

- Of the five employees that Insight fired since Legaspy took control of insight in December 2012, three were women age 56 or older and one was a 48 year-old man. PSOF ¶ 37; Pl. Resp. Br. at 15.

Also, as discussed earlier, Lebel put forth sufficient evidence undermining the sincerity of Insight's financial-based reason for terminating her employment. From this evidence, a reasonable jury could infer that discrimination, whether based on age or sex (or both), was the real explanation for the termination.

18

Against this, Insight contends there is no evidence establishing that Lebel was the subject of any derogatory remarks or conduct. Def. Br. at 7. Insight argues that the alleged shunning, isolation, and mockery she experienced at the hands of Legaspy and her coworkers are premised only on her unfounded perception. *Id.* at 9. Also, Insight points to Lebel's failure to testify as to (1) the substance of the meetings she was purportedly excluded from; and (2) the words her coworker's used when she believed they were mocking her. *Id.* at 11. Furthermore, Lebel does not dispute that Insight paid for her wife's flight and accommodations for Insight's July 2017 annual meetings in Las Vegas. Pl. Resp. DSOF ¶ 61. The couple even stayed at the hotel for an extra weekend on the company's dime. *Id.*

That is all well and good, but Insight is simply pointing out the absence of *direct* evidence of age and sex discrimination. But for purposes of summary judgment, the Court (and eventually the jury) must also consider *circumstantial* evidence as part of the "pile" of evidence and consider the total picture. *See Ortiz* 834 F.3d 760, 765-66 (7th Cir. 2016). When considering the circumstantial evidence, including evidence which successfully attacks the sincerity of Insight's proffered financial-based explanation, Lebel has established a triable issue of fact on her claims. Although Insight does offer some employment statistics,[8] this does not overcome the cumulative evidence supporting the claims when viewing the evidence in her favor. Of course, this does not necessarily mean Lebel would win at trial in front of jury—at trial, it

---

[8]Insight contends that at the time of Lebel's termination, 70% of Insights employees were older than 40 and half of the employees older than 40 were female. Def. Br. At 7; DSOF ¶ 55. It also contends that 54% of the employees it hired since January 1, 2018 were forty or older. Def. Br. at 8.

will be *Lebel* who bears the burden of proof, and the jury will be under no obligation whatsoever to view the evidence in her favor. At this stage, however, she has offered competent summary judgment evidence of discrimination as to her firing.

### B. Refusal to Hire

Aside from the loss of her job itself, Lebel also asserts that Insight refused to consider her for another position within the company when it was considering terminating her employment. This claim, too, survives summary judgment. Much of the evidence that Lebel offers to show discriminatory termination also supports her theory that she was passed over for other jobs due to discrimination as well. Again, *McDonnell Douglas* helps her here.

Lebel was in protected classes (a woman older than 40) and Insight was satisfied with her job performance. Def. Resp. PSOF ¶ 23; Lebel Dep. at 145:2-146.22. Lebel also offers enough evidence showing that Insight did consider her for other positions but refused to offer her any other job. First, Schwartz admitted that he went over the company's financials with Legaspy and asked Legaspy if he's "sure there was no other business that we had." Schwartz Dep. 75:13-76:2. Together, they determined that Insight lacked "enough revenue *anywhere else to maintain her with the company* … [so] she was laid off." *Id*. at 76:7-8 (emphasis added). Legaspy also testified that he did not consider Lebel for a "demotion" to another position within the operations department because "the operation department was fully staffed when the branch was eliminated … I did not have a position for Ms. Lebel." Legaspy Dep. at 142:19-144:19. When asked whether he could have created a new position for Lebel, Legaspy

20

testified, "[i]f I wanted to, yes, and I didn't want to." *Id.* at 145:24-146:3. So Insight did refuse to move her into another position.

Lebel also has presented enough evidence that similarly situated employees filled open positions within the operations department. Insight does not dispute that it hired David Lino, a 25-year-old man, to a Branch Liaison position seven days before it fired Lebel. Def. Resp. PSOF ¶ 14. As previously discussed, Lebel had experience in carrying out the duties of a Branch Liaison. *Id.* ¶ 4; Pl. Resp. DSOF ¶ 15; Lebel Dep. at 31:5-32:7; 215:5-216:10. As with the job termination, Lebel has established a *prima facie* case on a refusal-to-hire theory.

Insight's non-discriminatory explanations are that (1) there was insufficient revenue "anywhere else" to "maintain her with the company," Legaspy Dep. 76:7–8; and (2) the operations department was fully staffed once the Miami branch was terminated, *Id.* at 142:19–144:19. Again, as detailed earlier, on the revenue-based explanation, Lebel has sufficient evidence to rebut it. On the second reason—the full staffing of the Miami branch—the problem is that Insight hired Lino as a Branch Liaison *after* its decision to eliminate the Miami branch (before transforming it into a sales-based branch). DSOF ¶ 33. Lebel also points to testimony from Greenspan, who testified that, in January 2018, "there would have been work for any operations clerk at that time, I think." Greenspan Dep. 57:20-58:1. This suffices as evidence of pretext under *McDonnell Douglas*.

Again, when framed under the cumulative-evidence approach, Lebel has offered enough direct and circumstantial evidence to establish a triable issue of fact as

to whether Insight discriminated on the basis of age or sex when refusing to consider Lebel for other positions within Insight. This includes evidence that Insight hired a younger male to a Branch Liaison position after the decision was made to terminate her employment, despite Legaspy's claim that the operations department was fully staffed. PSOF ¶ 14; DSOF ¶ 33; Legaspy Dep. 142:19-144:19. Greenspan also testified that there would have been work for "any operations" clerk in January 2018. Greenspan Dep. 57:20-58:1. And to the extent Insight offered revenue constraints as a non-discriminatory reason for non-retention, Lebel has offered enough evidence that attacks the sincerity of that explanation.

So, to the extent that Lebel's claim seeks relief for the discriminatory refusal to retain her elsewhere within the company, that theory also survives summary judgment.

### C. Branch Manager of New Miami Branch

One point is worth making so that it does not show up at trial (if the parties do not settle). To the extent that Lebel's claims rely on the fact that Insight hired Paul Rozas as Branch Manager of the new sales-based Miami branch, no reasonable jury could rely on that evidence as support for Lebel's claims. Lebel cannot adequately rebut Insight's non-discriminatory explanations for that particular hiring decision. According to Insight, Rozas was hired because: (1) he was selected by the other representatives, De la Lama and Villareal, who would be financially responsible for the Branch Manager's compensation; (2) Lebel lacked supervisory experience specific to sales-generating branches; (3) Lebel did not speak Spanish, which would be helpful

in working at the branch; and (4) the Branch Manager had to be located on-premises. DSOF ¶ 42. Although Lebel offers some evidence rebutting the second and fourth explanations, Lebel Aff. ¶¶ 1-6 (prior experience supervising producing branches); Pl. Resp. DSOF ¶ 42(h) (no requirement, either written or in practice, that producing branches required on-premise supervisory principal), she does not overcome the others.

In response to the first explanation, Lebel contends that the representatives' approval was never required and that Rozas was hired simply because De la Lama and Villareal "wanted" him. Pl. Resp. DSOF ¶ 42(a). Even if true, that is a legitimate, non-discriminatory reason to hire Rozas over Lebel. There is no evidence that De la Lama and Villareal themselves were acting out of discriminatory motives. Neither does Lebel convincingly rebut the Spanish-speaking requirement. She argues that her lack of Spanish-language skills never precluded her from performing supervisory responsibilities for other producing branches. Pl. Resp. Br. at 14. But Lebel offers no evidence that those producing branches required a supervisor to speak Spanish. She also contends that Mayer, who does not speak Spanish either, was assigned to supervising branches. Lebel Aff. ¶ 8. But again, she points to no evidence suggesting that those branches had a Spanish-speaking requirement. For these reasons, Lebel has not presented enough evidence showing a triable issue of fact as to any discrimination involved in the hiring of Rozas as Branch Manager of the new Miami branch. So this particular hiring sequence cannot be offered at trial.

## IV. Conclusion

For the reasons explained above, Insight's motion for summary judgment is denied. With this decision in place, the parties shall promptly resume settlement negotiations. Lebel shall make a detailed written demand by November 23, 2020. Insight shall respond in writing by December 4, 2020. Insight shall email the settlement back-and-forth to the Court's Proposed Order email account on the same date. By December 8, 2020, the parties shall file a joint status report stating whether they want a settlement referral to the magistrate judge (they are welcome to email the courtroom deputy ahead of that deadline if they want a referral earlier), and if not, the parties shall provide an estimate of the trial length (including jury selection, jury addresses, and jury deliberations) and trial-week availability from February 2021 through the end of 2021. The tracking status hearing of November 20, 2020 is reset to December 15, 2020, but to track the case only (no appearance is required, the case will not be called).

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 17, 2020

24